## NON-EXCLUSIVE SERVICE DISTRIBUTION AGREEMENT

**THIS AGREEMENT** (the "Agreement") is made on the _____ day of _____ 200__,

**BETWEEN**

**INTELSAT U.K., LTD.** (the "Company"), a company incorporated under the laws of England and Wales whose registered office is _____; and

**[Insert Name of Applicable Entity]**, a [private/public] company incorporated under the laws of [_____] with registered number [_____] whose [registered office] [place of business] is located at [_____] (the "Distributor").

The Company and the Distributor shall each be referred to herein individually as a "Party" and collectively as the "Parties".

**WHEREAS**

    (A)    The Company desires to provide Satellite Capacity (as defined below) via the Space Segment (as defined below) and related services to the Distributor in accordance with the terms and conditions of this Agreement;

    (B)    The Distributor desires to procure Services (as defined below) from the Company and/or to be authorized to distribute such Services to its customers and Resellers (as defined below) in accordance with the terms and conditions of this Agreement;

    (C)    Each of the Company and the Distributor desires to set forth the Distributor's rights to procure, distribute or resell Services of the Company, as well as the terms and conditions that will apply to each particular type of Service; and

    (D)    Each of the Company and the Distributor desire to establish a framework for co-marketing and other commercial activities that the Company and the Distributor may choose to undertake, as well as to provide safeguards for the Distributor in the event that the Company establishes a Retail Business Division (as defined below).

**IT IS AGREED as follows:**

### 1.    DEFINITIONS AND INTERPRETATIONS

1.1    In this Agreement, including any Annexes hereto, the following terms shall have the following meanings unless otherwise expressly provided:

*Affiliate* means, with respect to one of the Parties, a person or entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by or is under common control with that Party; provided that for the purpose of the foregoing, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person or entity through the ownership of voting securities or otherwise.

EXHIBIT 1

*Authorization* means the authorization by the Company to the Distributor to procure and distribute Satellite Capacity via the Space Segment and related services pursuant to Section 4 hereof.

*Authorized Distributor* means any entity authorized by the Company (i) to procure Satellite Capacity via the Space Segment and related services and (ii) to distribute Services, in each case under any agreement, other than any agreement concluded with the Retail Business Division, on or following the Effective Date.

*Business Day* means a day (excluding Saturdays and Sundays) on which banks generally are open in England and Wales for the transaction of normal banking services.

*Charges* shall have the meaning set forth in Section 11.

*Closing Date* means the Closing Date under the Restructuring Agreement, i.e., the date of privatization of INTELSAT.

*Company Intellectual Property* shall have the meaning set forth in Section 18.1.

*Confidential Information* shall have the meaning set forth in Section 17.2.

*Current Satellites* means the Satellites listed in Annex A, through which the Company is providing Satellite Capacity via the Space Segment and related services as of the Closing Date, and any other Satellite which INTELSAT, acting pursuant to the authority of the Board of Governors of INTELSAT, has contracted to acquire as of the Closing Date.

*Distributor Advisory Committee* means the advisory group described in Section 8.1 and Annex B, as amended from time to time.

*Earth Station* means the antennas, switching facilities and related equipment (whether fixed or transportable) that form an interconnection point between the Satellites and terrestrial telecommunications networks or equipment located at customers' premises.

*Effective Date* means the later to occur of the date first above written or the Closing Date.

*Evolved Services* means any service other than an Existing Service that is provided on a Current Satellite or Subsequent Satellite following the Closing Date.

*Existing Services* means Lease Services, Channel and Carrier Services, Occasional Use Services, Demand-Based Services and Cable Restoration Services and any other service for which the Company provides Satellite Capacity via the Space Segment and related services that are offered by the Company as of the Closing Date.

*Force Majeure Event* shall have the meaning set forth in Section 34.

*Initial Service Rate Schedule* means the tariff schedule for Satellite Capacity via the Space Segment and related services as set forth in Annex C, as amended from time to time in accordance with Section 23.

*Initial Term* shall have the meaning set forth in Section 2.2.

*INTELSAT* means the intergovernmental organization known as the International Telecommunications Satellite Organization established by the Agreement Relating to the International Telecommunications Satellite Organization "INTELSAT" (the "INTELSAT Agreement") and the Operating Agreement relating thereto, done at Washington, D.C. on August 20, 1971, as amended (the "Operating Agreement").

*INTELSAT Agreement* shall have the meaning set forth in the definition of "INTELSAT."

*Intelsat, Ltd.* means Intelsat, Ltd., a company organized under the laws of Bermuda.

*Intelsat Technical Guidelines and Operating Procedures* means all relevant Intelsat Earth Station Standards ("IESS") modules, Space Segment Operations Guidelines ("SSOGs"), technical requirements documents, network operating procedures and performance criteria, a current list of which is provided in Annex D, as amended from time to time in accordance with Section 23, as well as future IESS modules and other related documents relating to Evolved Services.

*ITU* means the International Telecommunication Union.

*Non-Exclusive Service Mark License Agreement* shall have the meaning set forth in Section 4.5.

*Novation Agreement* means an agreement substantially in the form attached as Attachment D-3 to the Restructuring Agreement, among INTELSAT, the Distributor and the Company.

*NPV or Net Present Value* means, as of any determination date, the aggregate of the future payments for Service Charges to be made in respect of an applicable Service Contract, each discounted from its scheduled due date to present value on such determination date using a rate of 14% per annum, compounded quarterly. For purposes of the preceding definition, the scheduled due date for payments of Service Charges will be determined assuming that such Charges are billed on a quarterly in arrears billing cycle.

*Operating Agreement* shall have the meaning set forth in the definition of "INTELSAT."

*Ordering Procedures* means the procedures for ordering Services as set forth in Annex E, as amended from time to time in accordance with Section 23.

*Payment Due Date* shall have the meaning set forth in Section 11.5.

*Renewal Term* shall have the meaning set forth in Section 2.3.

*Reseller* means an entity that has contracted with the Distributor to distribute, promote, resell and bill Services to such entity's customers.

*Restructuring Agreement* means the agreement among, inter alia, INTELSAT, its Signatories and its Investing Entities which are a party thereto defining the conditions precedent to and transactions necessary for the restructuring of INTELSAT and which will be effective as of the "Effective Date" which is described therein.

*Retail Activities* shall have the meaning set forth in Section 6.1.

*Retail Business Division* shall have the meaning set forth in Section 6.2(a).

*Rules of Preemption* means the rules set forth in Annex F, as amended from time to time in accordance with Section 23.

*Satellite* means an object, located or intended to be located beyond the earth's atmosphere, that is or will be used for radio communications.

*Satellite Capacity* means capacity provided by the Company on any Satellite in connection with the provision of Services.

*Satellite Network Filing* means a filing at the ITU that lists a specific orbital location and specific technical parameters for a Satellite to operate at that orbital location.

*Services* means Existing Services and Evolved Services, or any one of them as the context requires, provided on the Current Satellites or Subsequent Satellites.

*Service Contract* means a commitment by the Distributor to reserve and procure and by the Company to provide Satellite Capacity via the Space Segment and related services in accordance with the terms hereof.

*Service Interruption* means any unavailability, delay or interruption of a Service carried on the Space Segment.

*Service Order* means an order under this Agreement of Satellite Capacity via the Space Segment and related services to be submitted by the Distributor to the Company (in accordance with the Ordering Procedures for a particular Service).

*Service Promotion Obligations* shall have the meaning set forth in Section 4.3(b).

*Service Rates* means the rates that apply to Satellite Capacity via the Space Segment and related services that are subject to a Service Contract between the Distributor and the Company hereunder.

*Service Specific Terms and Conditions* means the terms and conditions set forth in Annex G, as amended from time to time in accordance with Section 23.

*Space Segment* means the Satellites in orbit, and all related infrastructure owned, leased or operated by, or on behalf of, the Company to support the operation of the Satellites.

*Subsequent Satellite* means any C and/or Ku-Band Satellite through which the Company is providing Satellite Capacity via the Space Segment and related services acquired by the Company after the Closing Date, including any C and/or Ku-band Satellite that replaces a Satellite providing Existing Services or Evolved Services. If the Company adds an additional payload, that is not at C and/or Ku-band, to a Satellite that is acquired to replace a Current Satellite, or acquires a Satellite to replace a Current Satellite that has a non-C or Ku-band payload, solely the C and Ku-band portions of any such replacement Satellite shall be considered a "Subsequent Satellite" hereunder and the addition of such non-C and/or Ku-band payload shall not limit the rights of the Distributor to procure Satellite Capacity for Existing Services and Evolved Services in accordance with the terms hereof.

*Taxes* shall mean all taxes, including, without limitation, any withholding, excise, sales, value added, gross receipts, transfer and similar taxes, duties, imposts, fees and levies.

*Term* shall have the meaning set forth in Section 2.1.

*Urgent Operational Case* means a situation that, in the good faith opinion of the Company, on the basis of the information available to it, has caused or is likely imminently to cause: (i) damage to the Space Segment or the Satellites or related infrastructure of an entity other than the Company or (ii) major and sustained interference with Services provided by one or more Authorized Distributors.

*Value Added Services* means any products or services that are offered for use in conjunction with the Services that enhance their value or use and that are not inconsistent with the Intelsat Technical Guidelines and Operating Procedures.

1.2     Words in the singular include the plural and vice versa where the context requires.

1.3     For the purpose of this Agreement, a "Person" means any individual, corporation, partnership, joint venture, trust, unincorporated organization, association, pool, syndicate, sole proprietorship or government or agency or political subdivision thereof or any other form of organization not specifically listed.

1.4     Headings are for guidance only and do not affect the construction or interpretation of this Agreement.

1.5     In this Agreement, unless the context otherwise requires, references to Sections, paragraphs and Annexes are to Sections, paragraphs and Annexes of this Agreement.

1.6     The Annexes form part of this Agreement and any reference to this Agreement includes the Annexes.

1.7     The words "including" or "includes" shall be deemed to mean "including without limitation" and "including but not limited to" or "includes without limitation" or " includes but is not limited to" regardless of whether the phrases "without limitation" or "but not limited to" actually follow the words "including" or "includes."

1.8     Any reference to any statute or statutory provision in this Agreement shall be construed as a reference to the same as it may have been, or may from time to time be, amended, modified or re-enacted.

## 2.     TERM

2.1     Term. Subject to Section 2.4, the "Term" of this Agreement, unless it is earlier terminated in accordance with its terms and conditions, shall be the Initial Term of the Agreement or, as the context requires, the Initial Term and any Renewal Term as further described in this Section 2.

2.2     Initial Term. This Agreement shall have an initial term of five (5) years commencing on the Effective Date ("Initial Term").

2.3     Renewal Term. Upon the expiration of the Initial Term, at the Distributor's option, this Agreement may be renewed for a renewal period of five (5) additional years (a "Renewal Term") in accordance with the terms and conditions set forth herein.

The Distributor may exercise the option to renew this Agreement by providing written notice of its intention to renew to the Company by a date (the "Renewal Date") not later than ninety (90) calendar days prior to the last day of the Initial Term. The Distributor's option to renew this Agreement is contingent upon its satisfaction of the following condition as of the Renewal Date: the Distributor has remained in substantial compliance with, and is not in breach of, the terms and conditions of this Agreement, and in particular with the Service Promotion Obligations set forth in Section 4.3(a), other than the obligations set forth in Section 4.3(a)(ii). In the event that the Company, acting in good faith and in consultation with the Distributor, determines that the Distributor has not satisfied such condition for renewal, the Company shall not be obligated to renew this Agreement past the Initial Term.

Upon the expiration of any Renewal Term, upon the mutual agreement of the parties, this Agreement may be renewed for an additional renewal period, and upon such terms and conditions, as may be agreed by the Parties (any such agreed period also shall be referred to herein as a "Renewal Term").

2.4     Effect of Expiration. Upon the expiration of the Term, the terms and conditions of this Agreement will continue to apply (and this Agreement will remain in effect) only with respect to any Service Contract outstanding, if any, upon such expiration for the duration of the applicable Service Contract, unless this Agreement is earlier terminated in accordance with its terms and conditions; provided that, for the avoidance of doubt, the Distributor shall not be entitled to place Service Orders hereunder after such expiration of the Term, and provided further that the obligations of the Parties under Sections 4.3 and 4.4 shall terminate upon such expiration of the Term.

## 3.     CONDITIONS PRECEDENT

3.1     The obligations of the Company hereunder are subject to the satisfaction of the conditions precedent that the Distributor: [(i) shall have novated all of its service agreements and arrangements with INTELSAT relating to the provision of satellite capacity in effect as of the Closing Date pursuant to a Novation Agreement;] (ii) as of the Effective Date, shall not have any outstanding overdue indebtedness to INTELSAT or the Company under the Novation Agreement or the service agreements or arrangements being novated pursuant to the Novation Agreement; and (iii) as of the Effective Date, shall not otherwise be in material breach of the Novation Agreement or any service agreements or arrangements being novated pursuant to the Novation Agreement.

## 4.     SCOPE OF AUTHORIZATION

4.1     Authorization to Distribute the Services. The Company hereby authorizes the Distributor, on a non-exclusive basis, for so long as this Agreement remains in effect (in each case in compliance with the Intelsat Technical Guidelines and Operating Procedures and the terms and conditions hereof):

    (a)     to procure from the Company Satellite Capacity via the Space Segment and related services pursuant to a Service Contract for Services in accordance with the Ordering Procedures and other terms and conditions set forth in this Agreement;

(b)     to use such Satellite Capacity and related services (i) for its own use, or (ii) as a
        component of another product or service either for its own use or, subject to Section 9.5
        below, for resale to the Distributor's customers;

(c)     subject to Section 9.5 below, to sell or distribute Services to the Distributor's customers
        through such Earth Stations or other ground segment facilities as the Distributor may
        arrange;

(d)     to operate and, as necessary, construct Earth Stations to distribute Services via the Space
        Segment and to coordinate the Company's authorization and/or approval of Earth Station
        facilities on behalf of the Distributor's customers and Resellers; and

(e)     subject to Section 9.5, to resell or to engage Resellers for the purpose of reselling
        Services provided through Satellite Capacity via the Space Segment and related services
        procured hereunder and to provide Services to the Distributor's customers.

4.2     New Services. Upon the request of the Distributor, the Company shall engage in good faith
        negotiations with the Distributor relating to the provision of any Satellite Capacity for services
        (other than Existing or Evolved Services) to the Distributor and the terms and conditions upon
        which such services may be provided by the Company. If the Company chooses to offer Existing
        or Evolved Services on Satellites acquired for the provision of services other than Existing or
        Evolved Services, the Company will make such Existing or Evolved Services available to the
        Distributor in accordance with the terms and provisions of this Agreement.

4.3     Service Promotion by Distributor.

        (a)     In connection with its provision of Services via the Space Segment that the Distributor
                chooses to provide, and consistent with applicable laws and regulations, the Distributor,
                acting in good faith, shall use commercially reasonable efforts to:

                (i)     promote and distribute the Services, including the maintenance of an
                        appropriately skilled marketing and sales team capable of achieving the
                        marketing goals referenced in Section 4.3(a)(iv) below;

                (ii)    assist the Company in the development of its commercial strategy and in the
                        definition and understanding of general customer requirements;

                (iii)   provide to the Company a report, upon request from the Company, on a periodic
                        basis but no less than annually, concerning the Distributor's activities related to
                        the promotion and distribution of Services (in a format consistent with the
                        Parties' obligations regarding the protection of confidential and proprietary
                        information). Such report shall contain, at a minimum:

                        (A)     feedback on the results and effectiveness of any joint marketing efforts
                                and/or co-promotions undertaken with the Company;

                        (B)     promotional efforts undertaken by the Distributor, listing relevant trade
                                shows and conferences attended by the Distributor and providing
                                relevant customer feedback to the Company; and

(C)     sales and marketing activities undertaken to achieve objectives agreed upon with the Company.

In addition, such report may also include, where appropriate or relevant:

(D)     copies of promotional material, number of promotional units produced and number of promotional units distributed by the Distributor;

(E)     customer product lines that use Services provided by the Company;

(F)     press releases related to any Distributor product line roll-out utilizing Services of the Company or related to use of Services of the Company by the Distributor's major customers; and

(G)     copies of advertisements related to Services of the Company placed by the Distributor and copies of those publications in which such advertisements were placed.

(iv)     work with the Company toward the achievement of marketing and promotion goals to be agreed upon by the Parties; and

(v)     in the event that the Distributor develops Value Added Services, develop such Value Added Services in a manner consistent with the Intelsat Technical Guidelines and Operating Procedures.

(b)     The obligations of the Distributor set forth in Section 4.3(a) are referred to herein as "Service Promotion Obligations."

(c)     Upon achievement of the mutually agreed goals referred to in Section 4.3(a)(iv), the Company will make available to the Distributor, in a non-discriminatory fashion as compared to other service providers of the Company, further incentives that may take the form of credits against future orders or other types of discounts.

4.4     Service Promotion by the Company. The Company shall:

(a)     Provide the Distributor at a reasonably similar time as it provides to its other Authorized Distributors (i.e., generally within a 48 hour time period) with reasonable advance notice of the introduction of any change to the definition, description and/or parameters of any service generally made available to Authorized Distributors by the Company as well as any additions or changes to the overall portfolio of products generally made available to Authorized Distributors by the Company. Such advance notice should be:

(i)     no less than 60 days in the event of the introduction of any new or Evolved Services and/or significant enhancements, including technical enhancements, to Services; and

(ii)     no less than 30 days in the event of minor Company-introduced changes, including technical changes to Services that do not require operational changes on the part of the Distributor.

(b)     Work in good faith with the Distributor to establish cooperative marketing arrangements to optimize the distribution of Services. Such arrangements shall include, as mutually agreed by the Parties:

    (i)     provision to the Distributor of appropriate collateral and marketing support materials (subject to commercially reasonable conditions, such as cost reimbursement, where such support goes beyond agreed levels);

    (ii)    provision of product information and product-related training to the sales and marketing staff of the Distributor (subject to the reasonable availability of Company staff and reasonable Distributor reimbursement of expenses, as appropriate);

    (iii)   access by the Distributor to Company-sponsored customer or product-related forums;

    (iv)    cooperative involvement and/or joint activities at trade shows or similar events;

    (v)     provision to the Distributor of regular update reports on product and marketing initiatives; and

    (vi)    consultation with the Distributor on the development and refinement of marketing and product strategies and on the definition and understanding of present and future customer requirements.

(c)     Notify the Distributor of changes to the Intelsat Technical Guidelines and Operating Procedures as set forth in Section 23.

4.5     Service Marks. The Distributor shall have the right to enter into a non-exclusive service mark agreement with Intelsat, Ltd., in the form attached as Annex H, as may be amended from time to time pursuant to Section 23 (the "Non-Exclusive Service Mark License Agreement"), pursuant to which the Distributor will be authorized to use the Licensed Service Marks (as that term is defined in the Non-Exclusive Service Mark License Agreement) solely to the extent and upon the terms and conditions set forth in such Agreement. Each of the Company and the Distributor agrees that each of the Company and Intelsat, Ltd. shall otherwise retain all rights to, and the use of, its trademarks, servicemarks, tradenames and other intellectual property, in its sole discretion, and that the Distributor shall retain all rights to, and the use of, its trademarks, servicemarks, tradenames and other intellectual property, in its sole discretion.

## 5.    AUTHORIZATION IS NON-EXCLUSIVE

5.1     Non-Exclusive Authorization. The Authorization provided hereunder is non-exclusive, subject to Section 5.2 and applicable national law. The Company shall have the unilateral right to authorize any other entity, on a non-exclusive basis, (i) to resell or engage other entities to distribute, promote, resell and bill Services, and/or (ii) to procure Satellite Capacity via the Space Segment and related services for such entity's own use and/or for such entity to provide Services and/or (iii) to access and operate with the Space Segment utilizing Earth Stations approved by the Company, in each case on terms and conditions as the Company shall determine, pursuant to any form of agreement that is not inconsistent with the obligations of the Company under this Agreement.

5.2 No Geographic Exclusivity. The Distributor acknowledges and agrees that the Authorization does not provide any geographic exclusivity and that the Company shall have the right (in its sole and absolute discretion) to enter into distribution agreements with other Authorized Distributors in any country or other jurisdiction in which the Distributor may provide services at any time during which this Agreement remains in effect. The Company shall not restrict the Distributor from providing Services to or from any country or territory, consistent with the relevant laws and regulations in any such country or territory.

5.3 Confirmation of Other Authorized Distributors. Upon the Distributor's written request to the Company, subject to applicable law and any confidentiality obligations of the Company, the Company shall notify the Distributor of the identity of any other Authorized Distributors. The Distributor hereby agrees that the Company may disclose the Distributor's identity as an Authorized Distributor to any other Authorized Distributor of the Company.

5.4 Contractual and Equity Relations with Competitors Permitted. Except as otherwise expressly provided for herein or as otherwise prohibited by applicable law or regulation, nothing in this Agreement shall prevent either Party from entering into a contractual relationship with, or holding any economic interest in, any entity that competes with the other Party.

5.5 Company Not to Seek Exclusive Market Access. The Company shall not seek to become the exclusive provider of international and domestic satellite telecommunications services in any country or market or to prevent any entity, which competes with the Company, from providing services in any relevant country or market. Nothing in this Section 5.5 is intended to prevent the Company from participating in any regulatory or rulemaking procedure or to inhibit the Company's ability to exercise to the fullest extent the rights that it may enjoy under the applicable laws and regulations of any relevant jurisdiction. Nothing in this Section 5.5 shall prohibit the Company from participating in a response to a commercial bid, request for proposal or request for a quotation in any international or domestic market.

5.6 Applicability to All Service Contracts. The terms and conditions of this Agreement shall apply to any Service Contract to procure Satellite Capacity via the Space Segment and related services undertaken by the Distributor during the Term.

## 6. PROVISION OF RETAIL SERVICES BY COMPANY

6.1 Definition of Retail Activities. For the purposes of Section 6.2 of this Agreement, the term "Retail Activities" shall include any of the following activities when undertaken by the Company or any Affiliate of the Company, except where any such activity is required for the development of a product or Service which the Company will make available for distribution by Authorized Distributors on a non-discriminatory basis:

    (a)    establishment, acquisition or operation of an Earth Station;

    (b)    becoming the Affiliate of (or having any other direct or indirect ownership interest in) an entity that operates an Earth Station;

    (c)    reprocuring from the Distributor or any other Authorized Distributor Satellite Capacity that originally had been provided by the Company, or procuring Value Added Services from the Distributor or any other Authorized Distributor, in each case for the purpose of reselling such Satellite Capacity or Value Added Service to customers of the Authorized Distributors;

(d)     provision of Value Added Services in conjunction with Satellite Capacity via the Space Segment and related services unless such Value Added Services are provided to the Distributor and other Authorized Distributors on an equal basis; or

(e)     selling, or engaging in any direct marketing, canvassing or solicitation to any individuals or entities with respect to sale of, the Services or Value Added Services by the Retail Business Division (provided that nothing herein shall be deemed to preclude the Company from engaging directly in generic marketing activities to support the Company's or Intelsat, Ltd.'s brands).

6.2     Services through Separate Business Division. During the Initial Term (i.e., five years), the Company shall not engage in Retail Activities (as defined above) except in accordance with the following conditions:

(a)     Separate Business Division. The Company shall engage in Retail Activities only through a business division of the Company (the "Retail Business Division") that is separate from the other business division(s) of the Company in accordance with the terms of this Section 6.2. For the purpose of this Section, the term "separate" shall mean that:

    (i)     The Retail Business Division shall not share common employees engaged in sales or marketing customer-interface functions ("Sales and Marketing Staff") with any other business division of the Company. For purposes of this section, Sales and Marketing Staff shall not include operational staff that is involved in the delivery of service or executive personnel who serve an overall management function for the Company.

    (ii)    The Sales and Marketing Staff of the Retail Business Division shall not be co-located in the same workplace with any other business division of the Company engaged in the provision of Satellite Capacity via the Space Segment and related services to the Distributor or other authorized providers. For purposes of this Section 6.2(a)(ii), location of retail and wholesale staff in the same building shall not be considered co-location, as long as the staffs are physically separated.

    (iii)   Accounting separation procedures that are consistent with current SFAS 131, as of the Effective Date, shall be established to track revenues and costs, as appropriate; and the Company shall ensure that the direct assignment and allocation of costs for shared services provided by the Company to the Retail Business Division and other parts of the Company appropriately reflect the resources used by and for the Retail Business Division, in accordance with generally accepted accounting principles in the United States.

    (iv)    The Company shall not permit the Retail Business Division to procure Existing Services from any other business division(s) of the Company except through use of the Ordering Procedures detailed in Section 9.

(b)     Protection of the Distributor's Information. The Company shall ensure that the Distributor's specific Confidential Information, as defined in Section 17.2, that is provided by the Distributor to the Company is not disclosed to the Sales and Marketing Staff of the Retail Business Division. The Company shall establish a password-protected computer log-in system with electronic access tracking that is adequate to ensure that the Sales and Marketing Staff of the Retail Business Division cannot access areas of the

11

Distributor back-end systems or the electronic databases held by the Company that may contain such Confidential Information.

(c)     Establishment of Compliance Policies. The Company shall establish policies and procedures, including annual training of employees of the Retail Business Division, to assure compliance by the Company with the provisions of Section 6.2(b).

(d)     No More Favorable Terms. The Company shall provide Satellite Capacity via the Space Segment and related services to the Retail Business Division only on terms and conditions that are arms-length and are no more favorable than those terms and conditions made available to Authorized Distributors for comparable service commitments.

(e)     Equal Access to Information. Except with respect to information that the Company may communicate to the Retail Business Division and one or more Authorized Distributors for the purpose of undertaking a bona fide marketing or research and development effort, the Company shall ensure that any relevant information, in any form whatsoever, including verbal information that is conveyed by it, its directors, officers, employees or agents to the Sales and Marketing Staff of the Retail Business Division, shall be made available promptly to the Distributor and all other participating Authorized Distributors. For the purposes of this Section, "relevant information" means information which relates to the Company's wholesale activities involving the Satellite Capacity, Earth Station operations, the provision of Services or any other wholesale sales activities.

## 7.     CAPACITY MANAGEMENT AND SERVICE RESTORATION/PRIORITY OF SERVICE

7.1     Provision of Satellite Capacity. So long as this Agreement remains in effect, the Company shall provide Satellite Capacity via the Space Segment and related services on Current Satellites, or, if applicable, Subsequent Satellites, to enable the Distributor to be provided with Services hereunder. The Company shall provide Satellite Capacity consistent with the Authorization described in Section 4 and consistent with the relevant IESS and SSOG modules of the Intelsat Technical Guidelines and Operating Procedures. The provision of Satellite Capacity for services other than Existing Services or Evolved Services will be defined prior to their introduction and, as such, are not part of this Agreement.

7.2     Current Satellites. So long as this Agreement remains in effect, and subject to the terms set forth in this Agreement, the Company shall have the right to manage (replace, move or reconfigure) Satellites consistent with its operational requirements; provided that the Company maintains its ability to perform its obligations under this Agreement and other agreements relating to the provision of Services. The Company shall provide Satellite Capacity for Services on the Satellites as described in Annex A, as amended from time to time in accordance with Section 23, subject to applicable national regulatory and ITU requirements.

7.3     Use of Capacity of Current Satellites. The Company retains the right to utilize Satellite Capacity that is subject to a Service Contract, until the date on which Service under the Service Contract is scheduled to begin.

7.4     Operations Infrastructure. The Company shall provide, or shall procure the provision of, the operations infrastructure necessary to support the operation of the Satellites through which Existing Services are provided, and shall use such efforts as would be used by a competent

provider of Satellite Capacity acting reasonably under the circumstances to achieve the operational management coordination and control performance criteria set forth in the Intelsat Technical Guidelines and Operating Procedures, unless otherwise specified in individual Service Contracts.

7.5    Service Restoration/Priority of Services.

(a)    Acknowledgement and Agreement. The Distributor acknowledges and agrees to the principles for Service restoration and priority set forth in this Section 7 and in Annex F, which shall be deemed applicable to all Service Contracts under this Agreement unless otherwise specified in an individual Service Contract.

(b)    Purpose. Restoration procedures will be implemented in accordance with the Rules of Preemption and in accordance with restoration plans referred to in paragraph (c) below, which, in the event of a Space Segment malfunction, determine: (i) the order in which Services on the malfunctioning Satellite Capacity would be restored and (ii) the order in which Services on healthy Satellites would be preempted. In the case of a partial or total Satellite failure, relocation of a Service by the Company, in its own discretion, from the failed Satellite Capacity to alternative Satellite Capacity within thirty (30) days following the Space Segment malfunction will not be considered to be preemption, provided that the alternative Satellite Capacity provides at least equal performance over the required coverage area (and operates from the same orbital location, if this orbital location is critical to the successful operation of the applicable Service Contract), but shall be considered an "assignment" governed by the provisions of Section 7.5(e).

(c)    Restoration Plans. In the event of partial or total Satellite failure that results in loss of Service, the Company will:

(i)    advise the Distributor in writing within seventy-two (72) hours if the Service can be restored and, if so, the timetable for implementing such restoration. At the time the Company advises the Distributor of the proposed restoration plan, if pursuant to such proposed restoration plan, the proposed date of availability of restoration capacity to restore Service is later than the date thirty (30) days from the time of failure, the Distributor shall have the option to accept such proposed restoration plan or to terminate the applicable Service Contract until the proposed date for restoring the affected Service. If the Distributor does not respond to the Company's restoration plan proposal by the date for restoration of the Service, the Distributor shall be deemed to have elected that the applicable Service Contract will remain in effect and the Distributor will be charged accordingly;

(ii)    exercise commercially reasonable efforts to reassign the Distributor to equivalent alternative Satellite Capacity;

(iii)    provide outage credits for full-time Services for the outages related to partial or total Satellite failure in accordance with Section 7.6; and

(iv)    if the Distributor is unable to meet its obligations to its customers relating to an affected Service, agree to negotiate in good faith with the Distributor to seek a mutually agreeable resolution of such situation.

(d)     Reassignment in the Event of Certain Preemptions. In the event that a Space Segment malfunction is of such a scale that all preemptible leases have been preempted and additional Services need to be preempted, then the Company shall be entitled to preempt non-preemptible Services by reference to the Rules of Preemption. Notwithstanding the Rules of Preemption, upon the arrival of the INTELSAT IX system spare at 332.5E, non-preemptible leases on a non-failed Satellite will not be preempted to restore higher priority services. In the event of an in-orbit Space Segment malfunction, in accordance with the Rules of Preemption, the Company may preempt Service from a non-failed Satellite to restore services from the Satellite where the malfunction occurred. The preemption procedures that the Company may follow may require either:

    (i)     reassigning the Services from the orbital location where the malfunction occurred to the orbital location(s) of the restoration Satellite, or

    (ii)     the redeployment of a restoration Satellite to the orbital location where the malfunction occurred, either upon arrival of a replacement spare Satellite or immediately after the loss of the Satellite at the failed orbital location.

In the case of Satellite malfunction, the Company will take into account practical circumstances of geography and beam coverages in implementing the foregoing procedures.

(e)     Assignment to Alternate Capacity. Except as specifically set forth in the Service Specific Terms and Conditions, with respect to any Service Contract relating to designated Satellite Capacity, the Company may not assign new or alternative Satellite Capacity for the Service that is the subject of such Service Contract without the prior consent of the Distributor, which consent shall not be unreasonably withheld or delayed.

(f)     Right to Terminate. In the event of a reassignment to alternative capacity and/or a restoration plan that provides alternative capacity which fails to offer at least equal performance over the required coverage area (or which operates from a different orbital location if the original orbital location was critical to the successful operation of the applicable Service Contract) and such change demonstrably causes the Distributor to be unable to meet its obligations to its customers relating to an affected Service, then the Distributor will have the option to cancel the applicable Service Contract without penalty. If the Distributor wishes to exercise the right to terminate pursuant to the preceding sentence, it must advise the Company within seven (7) days of receiving notification of a reassignment or a restoration plan. Failure to offer at least equal performance under this Section 7.5 must be demonstrated by the submission to the Company by the Distributor of two (2) or more test measurements or the submission of other mutually agreed standard technical information clearly indicating the degree to which the affected Service does not meet the operational, technical and commercial parameters of the applicable Service Contract, including the technical specifications as approved in the associated transmission plan(s). Test measurements must be conducted under conditions mutually agreed between the Company and the Distributor.

7.6     Liability for Failure to Achieve Performance Criteria.

(a)     Outage Credits. Other than as provided for in this Section 7.6, the Company shall not incur any financial liability to the Distributor if the performance of any of the Satellites or of the operations infrastructure related to the performance of the Satellite Capacity fails

to achieve the performance criteria set forth in the Intelsat Technical Guidelines and Operating Procedures. In the event that the Company fails to meet the minimum performance criteria set forth in the Intelsat Technical Guidelines and Operating Procedures, and such failure is directly attributable to the Company or to the Space Segment, then the Distributor shall receive outage credits as follows (unless the Service Specific Terms and Conditions applicable to a Service provide for outage credits that are more favorable to the Distributor):

(i)     Subject to clause (ii), allowance or credit for any interruption in the availability of the Service will be made when the occurrence of such interruption is for one (1) hour or more. In such cases, the Distributor will be credited for the interruption in an amount equal to the proportionate part of the applicable charge, in one (1) hour multiples for each hour, or major fraction (i.e., thirty (30) minutes or more) thereof (except in the case of occasional use television, for which such duration must be in excess of ten (10) minutes).

(ii)    Outage credits will be credited for the period from the time of such failure until the time the alternate Satellite Capacity is available for restoration of Service up to a maximum of sixty (60) calendar days.

Credits for impaired performance under this Section 7.6(a) will be provided upon the submission to the Company by the Distributor of two (2) or more test measurements demonstrating the impaired performance. Such test measurements must be conducted under conditions mutually agreed between the Company and the Distributor.

(b)     Right to Terminate. In the event that the Company fails to meet the minimum performance criteria set forth in the Intelsat Technical Guidelines and Operating Procedures, and such failure is directly attributable to the Company or to the Space Segment, and such failure is for a duration of greater than fifteen (15) consecutive calendar days (equivalent to 360 hours), the Distributor will have the option to cancel the applicable Service Contract without penalty.

7.7     Transmission Interference.

(a)     Interference from Within the System. In the event of transmission interference which originates inside the Intelsat network and which has the effect of degrading the performance of a Distributor's Services such that the applicable Service fails to meet the minimum performance criteria set forth in the Intelsat Technical Guidelines and Operating Procedures, the Company will make commercially reasonable efforts to locate the source of the interference and to eliminate or reduce it to a non-damaging level. In cases where the Distributor has suffered demonstrable commercial harm as a result of interference originating within the Intelsat network, and the occurrence of the interference exceeds thirty (30) days, the Company and the Distributor agree to meet and negotiate the continuation, suspension, termination, restructuring or other disposition of the relevant Service Contract.

(b)     Interference from Outside the System. In the event of transmission interference originating outside the Intelsat network which has the effect of degrading the performance of a Distributor's Service such that the applicable Service fails to meet the minimum performance criteria set forth in the Intelsat Technical Guidelines and Operating Procedures, the Company will make commercially reasonable efforts to locate

the source of the interference and alert those entities which might be responsible for the interfering signal. In the event that the occurrence of the interference exceeds thirty (30) days, the Company and the Distributor agree to meet and negotiate the continuation, suspension, termination, restructuring or other disposition of the relevant Service Contract.

## 8.    DISTRIBUTOR ADVISORY COMMITTEE

8.1    Role of Distributor Advisory Committee. Taking account of pro-competitive considerations, the Distributor Advisory Committee will provide a forum for the Company and the Distributor to assess technical, operational and service provision matters of mutual interest. The Distributor Advisory Committee will provide feedback on issues related to optimizing the use of the Intelsat satellite network for the service provision requirements of Authorized Distributors. The terms of reference for the Distributor Advisory Committee are provided for in Annex B of this Agreement.

## 9.    ORDERING AND ACTIVATION OF SATELLITE CAPACITY

9.1    Ordering. Subject to Section 15.2, unless this Agreement is earlier terminated in accordance with its terms and conditions, the Distributor may order Services during the Term by submitting a Service Order in accordance with the Ordering Procedures; however, such right shall expire upon the expiration of the Term regardless of whether this Agreement remains in effect after such termination with respect to a particular Service Contract as described in Section 2.

9.2    Service Contracts.

(a)    Upon the Company's acceptance of a Service Order submitted by the Distributor, the terms of such Service Order shall constitute a Service Contract hereunder with respect to the Services which are the subject thereof. Unless expressly modified by the Parties, every Service Contract made by the Distributor and the Company hereunder shall be deemed to include the applicable Service Specific Terms and Conditions for the relevant Service and shall be subject to the other terms and conditions hereof, including the applicable requirements of the Intelsat Technical Guidelines and Operating Procedures. Except in cases where a provision hereof expressly refers to the terms as subject to the Service Specific Terms and Conditions applicable with respect to a particular Service Contract, in the event of any inconsistency between any of the provisions set forth in the body of this Agreement and the applicable Service Specific Terms and Conditions, the provisions set forth in the body of this Agreement shall control. The Company, at its discretion, may choose to allow the Distributor and other Authorized Distributors to participate in a Service Contract, on the terms and conditions as agreed between the Company, the Distributor and any such Authorized Distributors.

(b)    The Company shall be obligated to accept a properly completed Service Order hereunder, subject to the availability of appropriate Satellite Capacity in the Space Segment that the Company is generally making available to its Authorized Distributors (including the Retail Business Division). For the avoidance of doubt, the Company shall be entitled, in its sole discretion, to reserve Satellite Capacity in the Space Segment to enable the delivery of certain Services and choose not to make such Satellite Capacity generally available to its Authorized Distributors. Service Orders from all Authorized Distributors of the Company will be accepted by the Company on a first-come, first-served basis, determined based on the date of the Company's receipt of the applicable Service Order,

subject to considerations of overall efficiency of the Space Segment and the overall financial benefit to the Company.

9.3   Contact Information. The Company shall give the Distributor no less than fifteen (15) days' prior written notice in the event of any change in the contact information of the Company set forth in Section 27.2.

9.4   Testing and Activation. Subject to Section 10 below, the Company shall permit the Distributor to activate Service using the Satellite Capacity via the Space Segment and related services that is subject to a Service Contract upon completion of testing required by the Intelsat Technical Guidelines and Operating Procedures. Subject to Section 10, the Company shall use reasonable efforts to assign appropriate frequencies and complete the required testing by the start of service date requested by the Distributor and the Distributor shall cooperate to provide all information necessary to permit the Company to do so.

9.5   Terms and Conditions of Services to Distributor's Customers and Resellers. The Distributor shall be entitled to market and sell the Satellite Capacity via the Space Segment and related services that the Distributor purchases from the Company either directly or in conjunction with services provided through an Earth Station in order to provide Services to its customers and Resellers thereof. The Distributor shall have full rights and responsibility to establish the service rates at which the Distributor distributes Services to its customers and Resellers as well as the terms and conditions of such Services, provided that the Distributor shall be responsible for the compliance by its customers and Resellers with the Intelsat Technical Guidelines and Operating Procedures, any applicable laws, rules and regulations, and all other applicable terms and conditions of this Agreement.

9.6   Confidential Treatment of the Distributor's Customer Information. The Company shall treat as Confidential Information (within the meaning of Section 17.2) all information relating to the identity and corporate or personal details relating to the Distributor's customers and Resellers that the Company receives from the Distributor and shall not, without the consent of the Distributor (i) disclose such information to any third party or (ii) allow such information to be provided to the Company's Retail Business Division or to any person handling the sale of retail services.

9.7   Availability of Service Specific Terms and Conditions. The Company shall make available to the Distributor, prior to or at the time that the Distributor submits a Service Order, or upon the Distributor's request with respect to a particular Service, the Service Specific Terms and Conditions applicable, or that would apply, at such time to any Service Contract relating to the applicable Service.

9.8   Amendments to Service Contracts. The Distributor shall be entitled to request any amendments to any Service Contracts, such amendments to be subject to the mutual agreement of the Distributor and the Company. The Company's consent to any request by a Distributor pursuant to the preceding sentence shall not be unreasonably withheld or delayed; provided that in determining whether to grant such consent, the Company shall consider (i) the NPV of the amended Services as compared to the NPV of the Services currently provided under the Service Contract, (ii) the effect of such amendments on the overall efficiency of the Space Segment and (iii) the effect of such amendments on the overall financial benefit of such Services to the Company. Any such amended Service Contract will be governed by the terms and conditions (including Service Rates) as are agreed to between the Distributor and the Company in connection with such amendment.

10.    **COMPLIANCE WITH INTELSAT TECHNICAL STANDARDS**

10.1    Earth Stations to Comply with Technical Standards. The Distributor shall comply, or cause the compliance, with the Intelsat Technical Guidelines and Operating Procedures in respect of any Earth Station used, or authorized for use by the Distributor (including, for use by its customers and Resellers), in conjunction with any Satellite Capacity via the Space Segment and related services that is procured by the Distributor hereunder. The Company shall apply the same Intelsat Technical Guidelines and Operating Procedures to all Earth Stations of the same IESS standard used in conjunction with Satellite Capacity via the Space Segment and related services that is procured by other Authorized Distributors (including the Company's Retail Business Division), as are imposed on the Distributor hereunder except in the case where the Company has grandfathered existing Earth Station facilities at the time of revision of IESS standards.

10.2    Consequences of Noncompliance with Technical Requirements. If the Distributor fails to comply with its obligations under Section 10.1, the Company shall not be obligated to activate Satellite Capacity via the Space Segment and related services for use in conjunction with any non-compliant Earth Station. In the event that an Earth Station becomes non-compliant with the relevant Intelsat Technical Guidelines and Operating Procedures following activation, the Company shall give notice to the Distributor requiring such non-compliance to be remedied within a reasonable time (which shall not be less than ten (10) days except in Urgent Operational Cases), and if such non-compliance continues after the time specified in the Company's notice, the Company shall have the right, with immediate effect, to suspend the provision of Satellite Capacity via the Space Segment and related services in respect of the Earth Station concerned until the date on which the Distributor resumes compliance with the Intelsat Technical Guidelines and Operating Procedures, as determined by the Company acting in good faith. The Distributor shall not be relieved of its obligation to pay for any Service Contract undertaken hereunder by reason of the Company's suspension of the provision of Satellite Capacity via the Space Segment and related services in the event that such suspension is due to the noncompliance of an Earth Station used in connection therewith with the Intelsat Technical Guidelines and Operating Procedures.

10.3    Temporary Waivers. The Company may grant temporary thirty (30) day waivers, which may be extended by the Company, to the Intelsat Technical Guidelines and Operating Procedures after the Effective Date of this Agreement.

11.    **CHARGES AND PAYMENT TERMS**

11.1    Charges based on Service Rates. The Distributor shall pay to the Company, subject to the provisions of this Section 11, all charges ("Charges") for the Satellite Capacity via the Space Segment and related services provided by the Company to the Distributor pursuant to Service Contracts undertaken by the Distributor hereunder.

Subject to any discount that may be applied as contemplated by Section 4.3(c) or Section 12, the Charges shall be calculated in accordance with the Initial Service Rate Schedule, as amended from time to time in accordance with Section 23. The Charges shall be paid to the Company in US dollars or in any other freely convertible currency that is acceptable to the Company and otherwise in accordance with the invoice procedures in Section 11.5.

11.2    Security of Payment.

(a)    The Distributor may be required to provide Company with security in a form and amount, and pursuant to such other agreements, acceptable to the Company taking into account, among other things, the volume of business conducted between the Parties. Such security will be held as a guarantee for payment of all charges due under this Agreement and does not relieve the Distributor of any responsibility for the timely payment of amounts invoiced or otherwise payable to the Company. The Distributor shall provide collateral prior to the confirmation or commencement of Service.

(b)    Such security will be held for the life of the Service, or such lesser time as the Company may determine based on the payment history of the Distributor. For progressively activated Service, the Company may take into account the Distributor's payment history with respect to a certain level of Service in determining the level and duration of additional collateral required in the case of significant incremental activation.

11.3    Taxes. The Distributor agrees to pay all Taxes imposed on account of the Services provided under Service Contracts or payments made under this Agreement, other than Taxes of the jurisdiction under the laws of which the Company is organized or in which its principal office is located that are imposed on or measured by the Company's net income. The Distributor shall make any payments to the Company that are required hereunder free and clear of any such Taxes, so that the net amount actually received by the Company will equal the amount the Company would have received hereunder had no such Taxes been imposed. If any such Taxes are required to be withheld from amounts payable to the Company, or to the extent the Company (and not the Distributor) is required to pay or actually pays any such Taxes, any amounts payable to the Company by the Distributor hereunder shall be increased such that the net amount actually received by the Company after the withholding or payment of all such Taxes will equal the amount the Company would have received hereunder had no Taxes been imposed.

11.4    Introduction of Service Rates for Evolved Services. If the Company introduces an Evolved Service for which no Service Rate is listed in the Initial Service Rate Schedule at such time the Company shall be free to establish the Charge for that Service. Once such a Charge is established, the Initial Service Rate Schedule shall be modified accordingly.

11.5    Payment Terms. The Distributor shall pay the Charges for Satellite Capacity via the Space Segment and related services activated hereunder in U.S. dollars in accordance with the following payment terms:

(a)    Invoices will generally be rendered in U.S. dollars monthly within ten (10) days of the applicable month end and be due for payment forty-five (45) days (the "Payment Due Date") after the applicable month end. Balances unpaid after the Payment Due Date will be subject to interest charges of the London Interbank Offered Rate plus 4% per annum and no additional Service will be approved until payment in full has occurred. Other billing terms may be stipulated by the Company.

(b)    Service may be terminated for non-payment of past-due balances in accordance with the provisions of Section 15.2. If service is terminated for non-payment of charges as specified above, or pursuant to billing terms otherwise agreed between the Distributor and the Company, the Distributor shall not be relieved of its obligation to pay in full all Charges for the complete term for any Service Contract undertaken hereunder.

11.6    Invoice Disputes. The Distributor shall notify the Company as soon as possible but no later than forty-five (45) days after the applicable month end in the event of any dispute regarding the

Charges payable by the Distributor to the Company. The Distributor shall pay the undisputed amount of any invoice by the relevant Payment Due Date. The Company and the Distributor shall enter into discussions and shall use their best efforts, including reciprocal provision of relevant records, to resolve disputes within sixty (60) days from the relevant Payment Due Date. In the event that, as a result of such discussions, it is determined that the Distributor should pay any amount to the Company, the Distributor shall pay interest to the Company in the amount set forth in Section 11.5 for any amounts paid after the Payment Due Date notwithstanding initiation of such discussions.

In the event that the Company and the Distributor are unable to resolve a dispute in accordance with this Section 11.6 within the sixty (60) day period specified therein, either Party shall be permitted to pursue legal remedies available to it under applicable law.

Any invoice that has not been the subject of a dispute under the terms of this Agreement shall be considered final and shall not under any circumstances be subject to challenge by either Party after the date that is one year after the date of the invoice.

## 12.    NON-DISCRIMINATORY TREATMENT OF SIMILARLY SITUATED AUTHORIZED DISTRIBUTORS

12.1    Non-Discriminatory Treatment of Similarly Situated Authorized Distributors. The Company and the Distributor hereby agree that the Company shall treat all similarly situated Authorized Distributors of the Company in a non-discriminatory fashion with respect to Services, subject to commercial considerations and applicable laws and regulations and in accordance with the principles set forth in Sections 12.2 and 12.3.

12.2    Principles of Non-Discrimination. The Company and the Distributor hereby agree to the following principles relating to the Company's non-discriminatory treatment of Authorized Distributors with respect to Services. The Distributor should have an opportunity comparable to that provided to any other Authorized Distributor of the Company, as determined in good faith by the Company, to:

(a)    distribute any Service, on a non-exclusive basis; provided that the Distributor shall assume obligations to the Company comparable to those undertaken by any other Authorized Distributor in connection with such distribution rights, as determined by the Company, acting in good faith;

(b)    distribute Services in any geographic region; provided that such distribution would be in compliance with the applicable national laws and regulations of the applicable geographic region; and provided further that the Distributor shall assume obligations to the Company comparable to those undertaken by any other Authorized Distributor in connection with such distribution rights, as determined by the Company, acting in good faith;

(c)    participate with the Company in promotional and cooperative marketing activities;

(d)    maintain the confidentiality of its service and customer information;

(e)    participate in Company-sponsored customer and/or product-related fora; and

(f)  have access to information and support services, subject to the Company's confidentiality obligations and applicable law.

12.3  Discounts. In addition to any incentive made available pursuant to Section 4.3(c), the Company may establish a price discount system for the Services, including, but not limited to, performance-based and volume discounts. To the extent that the Company does establish such a discount system, the Company shall ensure that such system:

(a)  offers fair and equitable incentives for both large and small Authorized Distributors of the Company to increase their sales efforts;

(b)  takes into account the fact that service providers of the Company who are Authorized Distributors have obligations that service providers of the Company who are wholesale customers do not; and

(c)  is implemented in a non-discriminatory manner among the Authorized Distributors of the Company and is based on measurable, quantifiable parameters.

12.4  No Favorable Treatment. The Company and the Distributor hereby agree that the Company, to the extent that it undertakes retail activity through its Retail Business Division, shall treat its Retail Business Division for purposes of this Section 12 as an Authorized Distributor of the Company.

13.  **FURTHER UNDERTAKINGS**

13.1  Further Undertakings of the Distributor. In addition to other obligations of the Distributor set forth herein, the Distributor agrees as follows:

(a)  if the Distributor chooses to provide Services via the Company's Satellite Capacity via the Space Segment and related services, to do so (and require its customers and Resellers to do so) in compliance with applicable national laws, rules and regulations and to cause any Earth Stations utilized in the provision of such Services to comply with any applicable national laws, rules and regulations;

(b)  not to hold itself out as agent for the Company in any correspondence or other dealings relating directly or indirectly to the provision of the Satellite Capacity via the Space Segment and related services; provided that, if the Distributor has executed a License Agreement, the Distributor may use the trademarks identified in such agreement upon the terms and conditions set forth in such License Agreement; and

(c)  if the Distributor chooses to provide Services via the Company's Satellite Capacity via the Space Segment and related services, to procure and maintain (and require its customers and Resellers to procure and maintain) all licenses, approvals and government authorizations necessary to enable the Distributor to operate its Earth Station(s).

13.2  Further Undertakings of the Company. In addition to the other obligations of the Company set forth herein, the Company agrees as follows:

(a)  to procure and maintain all licenses, approvals and government authorizations necessary to provide the Satellite Capacity via the Space Segment and related services to the Distributor hereunder, other than any such licenses, approvals and government

21

authorizations relating to the operation of applicable Earth Stations, and to comply with all statutes, by-laws, regulations and requirements of any government or other competent authority applicable to the Company;

(b)   to use its best efforts in undertaking such steps as are necessary to assure that the Company (or Intelsat LLC) is entitled to maintain orbital slots for the Satellites at the orbital positions contemplated in this Agreement and to undertake such steps as are necessary to maintain those slots for so long as this Agreement remains in effect in accordance with applicable national law and ITU regulations; and

(c)   not to hold itself out as agent or principal of the Distributor in any correspondence or other dealings relating to the provision of Services via the Space Segment; and

(d)   upon the Distributor's request, to use its reasonable efforts to de-activate Satellite Capacity via the Space Segment and related services that the Distributor has activated hereunder in order to permit the Distributor to enforce its rights under the Distributor's agreements with its customers and Resellers or as required to permit the Distributor to comply with applicable law and regulation (provided that the Distributor shall remain liable to pay for the Satellite Capacity via the Space Segment and related services subject to its Services in accordance with this Agreement).

## 14.   SUSPENSION OF AUTHORIZATION

14.1   Failure of Compliance with Agreement Terms by the Distributor. If the Distributor fails to comply with any material term of this Agreement, then the Company may give to the Distributor written notice which shall specify the term or terms of this Agreement in respect of which the Distributor is not compliant. If the Distributor fails to cure the lack of compliance within a period of thirty (30) days from the date of such notice (or such longer period as may be permitted by the Company), the Company may suspend the Authorization at any time thereafter upon giving written notice to the Distributor; provided that, subject to Section 9, the suspension of the Authorization under this Section 14.1 shall apply prospectively to Service Orders to be submitted by the Distributor following the date of such suspension and shall not operate to nullify or invalidate all or any part of Service Contracts undertaken by the Distributor prior to such date.

14.2   No Limitation on Other Rights. The Company's right to suspend the Authorization under this Section 14 shall be in addition, and without prejudice, to the rights of the Company to suspend the Authorization under other express provisions of this Agreement or to terminate this Agreement in accordance with Section 15.

14.3   Lift of Suspension. Subject to the rights of the Company under the provisions of Section 15, the Company shall lift the suspension of the Authorization on the date on which the Distributor resumes compliance with the terms of this Agreement.

## 15.   TERMINATION RIGHTS OF THE PARTIES

15.1   Termination for Cause. Either Party (the "Terminating Party") may terminate this Agreement (including any Service Contract hereunder) where the other Party (the "Defaulting Party") is in default in the performance of any material term under this Agreement (other than a payment default, which is covered by Section 15.1(b) or Section 15.2) and has failed to cure the default within sixty (60) days from the date of written notice from the Terminating Party. In addition, the Terminating Party may terminate the Agreement by written notice to the Defaulting Party if:

(a)     any representation or warranty made by the Defaulting Party hereunder shall be incorrect or untrue in any material respect at the time that it is made and, if such breach was a breach of the representation or warranty set forth in Section 21.1(d) or Section 21.2(c), such representation or warranty also is incorrect or untrue in any material respect as of the date thirty (30) days after the provision of written notice of such breach by the Terminating Party to the Defaulting Party; provided that if the Defaulting Party is the Distributor, the Company may suspend the provision of Service pursuant to any Service Contract to which such representation or warranty relates during such 30-day period;

(b)     the Defaulting Party fails to make payment of any sum due and owing to the Terminating Party (other than payments of Charges for Services, which are covered by Section 15.2), and such failure continues for a period of thirty (30) days (or such longer period as may be agreed by the Terminating Party) after provision of written notice of such failure by the Terminating Party to the Defaulting Party;

(c)     the Defaulting Party files a voluntary petition in bankruptcy or shall be adjudicated as bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, composition, readjustment, liquidation or similar relief for itself under any applicable statute, law or regulation, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator for itself or a substantial part of its properties, or shall make any general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due; or

(d)     a petition is filed against the Defaulting Party seeking any reorganization, composition, readjustment, liquidation or similar relief under any applicable statute, law or regulation, and such petition shall remain undismissed or unstayed for an aggregate of sixty (60) days (whether or not consecutive), or any order for relief in respect of such petition is entered; or if any trustee, receiver or liquidator of the Defaulting Party is appointed for it or a substantial part of its properties, which appointment shall remain unvacated or unstayed for an aggregate of sixty (60) days (whether or not consecutive).

15.2    Termination for Non-Payment of Charges.

(a)     If the Distributor has failed to make any payment (including a partial payment) for Charges on a particular invoice relating to Service Contracts hereunder which are not being disputed in accordance with Section 11.6 by the applicable due date for payment (or, if such Charges are being disputed in accordance with the provisions of Section 11.6, by the date of the resolution of the dispute or the expiration of the sixty (60)-day period referred to in Section 11.6), the Company may terminate this Agreement (including any Service Contract hereunder) by written notice to the Distributor.

(b)     If the Distributor has failed to pay at least 75% of the Charges on a particular invoice relating to Service Contracts hereunder which are not being disputed in accordance with Section 11.6 by the date thirty (30) days after the applicable due date for payment (or, with respect to any of such Charges which are being disputed in accordance with Section 11.6, the Distributor has failed to pay at least 75% of such Charges by the date thirty (30) days after the date of the resolution of the dispute or the expiration of the sixty (60)-day period referred to in Section 11.6), the Company may terminate this Agreement (including any Service Contract hereunder) by written notice to the Distributor.

(c)     If the Distributor has failed to pay the full amount of Charges on a particular invoice relating to Service Contracts hereunder which are not being disputed in accordance with Section 11.6, but has paid at least 75% of such Charges by the date thirty (30) days after the applicable due date for payment (or with respect to any of such Charges which are being disputed in accordance with Section 11.6, by the date thirty (30) days after the date of the resolution of the dispute or the expiration of the sixty (60)-day period referred to in Section 11.6), then the Company may allocate amounts paid by the Distributor among any Service Contracts hereunder to which any of such overdue Charges relate, and may take into account any instructions that the Company may receive from the Distributor. After amounts paid by the Distributor are applied pursuant to the preceding sentence, the Company, upon notice to the Distributor, may terminate any Service Contract hereunder with respect to which any such overdue Charges remain.

(d)     If the Distributor has failed to pay on the applicable due date, with respect to two consecutive invoices, or with respect to two invoices in any calendar year, the full amount of Charges on such invoices relating to Service Contracts hereunder that are not being disputed in accordance with Section 11.6 then, notwithstanding paragraphs (b) and (c) above, if such Charges have not been paid in full by the date thirty (30) days after the later to occur of such due dates, the Company may terminate this Agreement (and any Service Orders hereunder) by written notice to the Distributor.

15.3    Distributor's Right to Terminate for Convenience. At any time during the Term, the Distributor may choose to terminate its Service Promotion Obligations pursuant to Section 4.3 hereof for its convenience upon at least three (3) months' written notice to the Company. In the event that the Distributor chooses to so terminate such Service Promotion Obligations, notwithstanding any other provision of this Agreement, the Distributor's right to order Services hereunder and the Company's obligations pursuant to Section 4.4 also shall terminate on the date such Service Promotion Obligations terminate.

## 16.     CONSEQUENCES OF TERMINATION OR EXPIRATION

16.1    Payment of Charges. Upon the termination or expiration of this Agreement (or termination of any particular Service Contract hereunder) for whatever reason, any outstanding indebtedness of the Parties to one another shall become immediately due and payable together with any interest due (calculated in accordance with Section 11.5); provided that in the event that this Agreement is terminated due to the uncured material default (including a payment default) of the Distributor, the amounts payable by the Distributor to the Company upon termination shall include any Charges that would have been payable in accordance with the terms of any outstanding Service Contracts of the Distributor so terminated, plus the costs of collection, and for purposes of determining any termination charges under the Service Specific Terms and Conditions, the Distributor will be deemed to have terminated any such Service Contract. In the event that this Agreement is terminated due to the uncured material default of the Company, such Service Contract-related Charges that are in excess of the Services actually activated hereunder in accordance with the terms of such Service Contract shall not be payable.

In the event that Service under any Service Contract is suspended pursuant to Section 15.1(a), Charges with respect to such Service Contract will continue to accrue during such suspension period in accordance with the terms of such Service Contract.

16.2    No Further Obligation to Provide Satellite Capacity. Upon the termination or expiration of this Agreement for whatever reason, the Company shall no longer be obligated to provide Satellite

Capacity via the Space Segment and related services to the Distributor hereunder and the Distributor shall cease to provide Services via the Satellites through any Earth Stations that are within the scope of the termination.

16.3 Other Consequences. In addition to the foregoing, upon termination or expiration of this Agreement:

(a) The Parties shall each return to the other or, if requested by the Disclosing Party (as defined in Section 17.1), destroy all Confidential Information (as defined in Section 17.2) belonging to the other Party. Any destruction of documents must be confirmed in writing to the Disclosing Party.

(b) The Distributor shall have the right to make any transitional arrangements that it deems fit with respect to its customers, unless otherwise mutually agreed by the Parties.

The rights set forth in this Section 16 shall not prejudice any other right or remedy of either Party at law.

17. **CONFIDENTIALITY**

17.1 Confidentiality Obligation. The Company and the Distributor hereby agree that it may be necessary to the performance of this Agreement for a Party (the "Disclosing Party") to disclose to the other Party (the "Receiving Party") certain information that the Disclosing Party deems to be confidential and proprietary. Subject to Section 17.4, the Receiving Party shall use the same standard of care to maintain the security and confidentiality of all Confidential Information (as defined below) received from the Disclosing Party hereunder in accordance with the terms of this Section 17 as such Receiving Party uses in the maintenance of the security and confidentiality of its own confidential information, but in no event shall the Receiving Party use less than reasonable care in maintaining such security and confidentiality.

17.2 Confidential Information. For purposes hereof "Confidential Information" shall include (i) information deemed to be Confidential Information under Section 17.3 and (ii) technical information, customer lists and other business information or data relating to the Disclosing Party, its Affiliates or other representatives that is reduced to writing and marked "Confidential" or with a similar designation by the Disclosing Party. Notwithstanding anything contained herein to the contrary, Confidential Information shall not include (i) information developed independently by the Receiving Party or lawfully received from a third party not under an obligation of confidentiality or (ii) information in the public domain.

17.3 Distributor Information. The Company shall treat all information that the Company receives from the Distributor specifically relating to the Distributor's customers or Resellers as Confidential Information hereunder and shall use such information only for the purpose intended by the Distributor.

17.4 Nondisclosure to Third Parties. Without limitation of the Company's obligations pursuant to Section 6, the Company shall not, without the written consent of the Distributor, disclose Confidential Information to any third party except:

(a) as part of its normal reporting or review procedures to: (i) its parent company, (ii) its auditors and (iii) its attorneys; provided that any other third party to whom disclosure is made agrees to the confidential treatment of such information;

(b)     information required to be disclosed to regulatory agencies; provided that the Company shall seek confidential treatment of such information and shall, if possible, provide prior notice to the Distributor of such disclosure and comply with the reasonable requests of the Distributor in connection with such disclosure to the extent permitted by applicable law;

(c)     in order to enforce its rights and perform its obligations pursuant to this Agreement;

(d)     to the extent necessary to obtain appropriate insurance, to its insurance agent; provided that such agent agrees to the confidential treatment of such information; and

(e)     as required pursuant to law, judicial order or governmental regulation.

17.5    Survival. Notwithstanding anything else in this Agreement, the obligations contained in this Section 17 shall survive the termination or expiration of this Agreement for a period of three (3) years.

## 18.    **INTELLECTUAL PROPERTY**

18.1    Intelsat Intellectual Property. The Company represents and warrants that it has the right to use the Intelsat Technical Guidelines and Operating Procedures, including the patents, trade secrets, copyrights and other intellectual property embodied therein (but excluding any trademarks, servicemarks or tradenames) (collectively referred to as the "Company Intellectual Property").

18.2    License to Intelsat Intellectual Property. The Company hereby grants the Distributor the non-exclusive right to use the Company Intellectual Property solely to the extent reasonably necessary in order to use the Services in accordance with the terms hereof. The license granted herein shall include the right to sublicense to any entities with which the Distributor has contracted for down-stream use of Services provided hereunder ("Relevant Entities") the right to use such Company Intellectual Property solely to the extent reasonably necessary to use such services in accordance with the terms hereof. Any such sublicense shall be no greater in scope than the license granted herein. The license granted by this Section 18.2 is contingent on the Distributor (including the Relevant Entities) protecting the Company's rights in the Company Intellectual Property, including monitoring and enforcing the terms of use against the Relevant Entities. Without limitation of the Distributor's obligations under Section 13, the Distributor agrees to comply with all applicable export and re-export laws and regulations in connection with the transfer, delivery or disclosure of the Company Intellectual Property. Except for the limited rights granted by this Section 18, all rights to the Intelsat Technical Guidelines and Operating Procedures shall remain the property of the Company; the Distributor will not have, and shall not provide to the Relevant Entities, any other right of use unless otherwise expressly mutually agreed by the Company and the Distributor in writing signed by duly authorized representatives of each such Party.

## 19.    **DISCLAIMERS OF LIABILITY**

19.1    No Liability for Service Interruption. Subject to Section 19.2 and except as otherwise provided for in Section 7.6, the Distributor agrees that the Company (for itself and as trustee for the benefit of the other indemnitees, as defined in Section 19.5) shall not be liable on any basis whatsoever to the Distributor, or its Affiliates, Resellers or customers, for and the Distributor shall hold the Company harmless from, any direct, indirect or consequential loss, damage or expense, including, without limitation, loss of profits or revenues, loss of distribution rights, abortive expenditure or damage to property and injury or death to persons, arising from or in connection with any Service

Interruption, regardless of cause including, but without limitation, satellite or other equipment failure or malfunction, or any unavailability, delay or interruption of telecommunication services caused as a result thereof.

19.2    Direct Damages. Subject to Sections 19.3 and 19.4 and the Distributor's obligation to take reasonable steps to mitigate damages, nothing in Section 19.1 shall limit the Distributor's right to claim direct damages arising from the Company's failure to provide Services pursuant to any Service Contract undertaken hereunder, provided that such direct damages (i) shall be limited to money actually expended by the Distributor to replace the capacity not provided by the Company less the Charges applicable to the Services which the Company has failed to provide, reduced by the value of any service allowances or credits provided to the Distributor; (ii) shall be limited to damages in respect of non-preemptible Services; (iii) in no event shall be greater than the lesser of (A) the amount of consideration actually paid to the Company with respect to such Service Contract and (B) the Charges that would have been payable under the applicable Service Contract in respect of the Services not yet provided by the Company; (iv) shall not be payable with respect to Services being provided on demand; and (v) shall not be payable in the event that the Distributor is in breach of its obligations to the Company with respect to such Service Contract or in the event that the Company's failure to provide such Services does not amount to a breach of this Agreement, including in circumstances where Services have been preempted in accordance with Section 7 and the Rules of Preemption.

19.3    Damage to Satellites. [The Distributor shall be liable to the Company, and shall indemnify and hold the Company and the other indemnitees (as defined in Section 19.5) harmless vis-à-vis claims by any third party (including but not limited to other Authorized Distributors) against the Company, for any loss or damage to the Satellites used for the provision of Services hereunder caused by any act or omission of the Distributor, its Resellers or customers (including, without limitation, the Earth Stations of such entities), except that the Distributor shall have no liability to the Company for loss or damage arising out of the provision of Services by the Distributor via the Satellite Capacity via the Space Segment and related services in a manner consistent with the terms and conditions of this Agreement, the Intelsat Technical Guidelines and Operating Procedures or as otherwise authorized in writing by the Company.]

19.4    No Liability for Indirect Damages. IN NO EVENT SHALL EITHER PARTY HEREUNDER BE LIABLE FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR UNDER THIS AGREEMENT WHETHER UNDER CONTRACT, WARRANTY, OR TORT OR OTHERWISE, INCLUDING LOSS OF REVENUE OR PROFITS, REGARDLESS OF THE FORESEEABILITY OF SUCH DAMAGES. Nothing in this Agreement shall exclude or limit the liability of either Party for death or personal injury resulting from such Party's own negligence in any jurisdiction where, as a matter of law, such liability cannot be excluded or limited.

19.5    Indemnities.

    (a)    As used in this Section 19.5, the term the "other indemnitees" means any Affiliate, or director, officer, employee or agent of an Indemnified Party (as defined below) or of its Affiliates. Either Party (the "Indemnifying Party") shall indemnify the other Party (the "Indemnified Party") and the other indemnitees from and against any direct, or indirect loss, damage, liability or expense arising from any claim by a third party, pursuant to or in connection with:

(i)     any libel, slander, or invasion of privacy or any allegation thereof by the Indemnifying Party, its Affiliates, Resellers or customers, as the case may be, arising in connection with the provision of Services via the Satellite Capacity via the Space Segment and related services;

(ii)    any infringement or alleged infringement of any patent, copyright, design, trademark, trade name, service mark, logo, trade secret or other moral, industrial or intellectual property rights whatsoever of any other person by the Indemnifying Party, including without limitation, infringement or alleged infringement arising in connection with combining or using in connection with the provision of Services via the Space Segment as authorized hereunder, any apparatus or systems of the Indemnifying Party, its Affiliates, Resellers or customers; or

(iii)   any breach of its obligations under Section 10.1.

(b)     For the purpose of subparagraph (a) above, other Authorized Distributors shall not be deemed to be the "customers" of the Company and the Company shall not be obligated to indemnify the Distributor for claims arising hereunder that are attributable to an other Authorized Distributor.

(c)     Notwithstanding the foregoing, neither Party shall be under any obligation to indemnify the other Party or the other indemnitees of the other Party under this Section if any such claim would have arisen against the Party seeking indemnification under this Section 19.5 regardless of the alleged acts or omissions of the Party from which indemnification is sought or those of its Affiliates, Resellers or customers.

19.6    Defense of Indemnified Claims.  With respect to any claim for damage or loss that is required to be indemnified hereunder, the Indemnifying Party shall, at its own expense, defend any such claim subject to the conditions that the Indemnified Party (or, as the case may be, the other indemnitees) shall give the Indemnifying Party reasonable notice of the receipt of any such claim, and provide such cooperation to the Indemnifying Party as is reasonably necessary for the defense of the claim, including, without prejudice to the generality of the foregoing, the filing of all pleadings and other court processes, the provision of all relevant information and documents, and providing reasonable access to relevant employees.  If, in the event of any claim subject to Section 19.5, the applicable law does not permit the Indemnifying Party to defend the claim as contemplated herein, then the Indemnified Party shall conduct its defense under instructions from the Indemnifying Party and shall not make any admissions, settlements or compromises without the prior written consent of the Indemnifying Party.

19.7    Survival following Termination.  The provisions of Sections 19.5 through this Section 19.7 regarding indemnification shall survive the expiration or termination of the Agreement.

## 20.    INSURANCE

20.1    [Liability Insurance.  The Company and the Distributor shall each maintain liability insurance from a third party insurer or self-insurance in an amount sufficient to cover the indemnities which each Party has granted, respectively, under this Agreement, to the other Party. Each Party shall, upon request of the other Party, provide the other Party with evidence of such insurance or, as the case may be, net asset value that is sufficient to cover the indemnities granted under this Agreement.

20.2    Third Party Claims. In addition to the insurance described in Section 20.1, the Company shall obtain and maintain insurance (in a commercially reasonable amount that is standard for the satellite communication services industry) to cover third party claims resulting from a Service Interruption of any nature whatsoever that relates to the availability of the Space Segment. At its option, the Distributor shall be named as an additional insured on such policy, in which event, the Distributor may be required to contribute, along with other Authorized Distributors, to the cost of such insurance policy. Any such contribution will become payable within thirty (30) days of the date of the receipt by the Distributor of an invoice from the Company. The Company shall also provide such other information about such insurance policy as the Distributor may reasonably request.] **[subject to final decision by the BG]**

21.    **REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS**

21.1    Representations and Warranties of the Company. The Company represents and warrants to the Distributor that the following statements are true and accurate as regards the Company as of the date of the signing of this Agreement and are deemed to be repeated on the Effective Date:

(a)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action on the part of the Company;

(b)    the Company owns or leases the Satellite Capacity via the Space Segment and related services (and certain related ground equipment) and has a right to use the Satellite Network Filings and associated frequency spectrum for the Satellite Capacity via the Space Segment and related services throughout the Term;

(c)    this Agreement constitutes the legal, valid and binding obligations of the Company;

(d)    the Company has obtained (or, in the case of Service Orders, will have obtained prior to commencing provision of any Services under the Service Contracts that result from such Service Orders) all applicable clearances, telecommunications and other licenses, consents and approvals necessary to enable it to provide the Services, other than those applicable to Earth Stations, and to perform its other obligations under this Agreement; and

(e)    to its knowledge, the Company is in compliance with, and performance of its obligations hereunder will not violate or conflict with, any applicable telecommunications or other law and regulation of any jurisdiction to which it is subject governing any ground-based infrastructure supporting the Satellite Capacity via the Space Segment and related services, other than those applicable to Earth Stations.

21.2    Representations and Warranties of the Distributor. The Distributor represents and warrants to the Company that the following statements are true and accurate as regards the Distributor as of the date of signing of this Agreement and are deemed to be repeated on the Effective Date:

(a)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action on the part of the Distributor;

(b)    this Agreement constitutes legal, valid and binding obligations of the Distributor;

(c)    the Distributor has obtained (or, in the case of Service Orders, will have obtained prior to commencing receipt of Services under the Service Contracts that result from such Service

Orders), and performance of its obligations hereunder will not violate or conflict with, all applicable clearances, telecommunication and other licenses, consents and approvals necessary to enable the Distributor to operate its Earth Station(s), to receive, distribute, resell, promote, use and provide the Satellite Capacity via the Space Segment and related services and to perform any of its other obligations under this Agreement; and

(d)     to its knowledge, the Distributor is in compliance with, and performance of its obligations hereunder will not violate or conflict with, any applicable telecommunications or other law or regulation of any jurisdiction to which it is subject.

## 22.     TIME LIMITS

Any period of time referred to in this Agreement shall be counted from the day following the event marking the start of the period of time and shall end on the last day of the prescribed period. When the last day of a period of time is not a Business Day, the period shall be extended to the next Business Day.

## 23.     AMENDMENTS

23.1    No Amendment without Consent. Subject to Sections 23.2 and 23.3 and except as otherwise expressly provided in this Agreement, the terms and conditions of this Agreement shall not be amended or modified except with the written consent of both the Company and the Distributor.

23.2    Urgent Operational Cases. Notwithstanding any other provision of this Section 23 but subject to the last sentence of Section 10.1, the Company may amend in any manner the Intelsat Technical Guidelines and Operating Procedures, including with application to Service Orders or Service Contracts outstanding on the date of such amendment, without consulting or obtaining the consent of the Distributor in the event of an Urgent Operational Case. However, the Company shall provide to the Distributor notice of the amendment, evidence of the Urgent Operational Case and sufficient information to allow the Distributor to evaluate the technical consequences of the amendment. Amendments to the Intelsat Technical Guidelines and Operating Procedures, pursuant to this Section 23.2 in the event of an Urgent Operational Case shall be effective as of the date the Company may reasonably determine.

23.3    Certain Amendments. Notwithstanding any other provision of this Section 23, the Company may, from time to time and without the Distributor's consent, written or otherwise, amend the following provisions of this Agreement: (i) the list of Current Satellites; (ii) the Initial Service Rate Schedule; (iii) subject to the last sentence of Section 10.1, the Intelsat Technical Guidelines and Operating Procedures; (iv) the Ordering Procedures; (v) the Rules of Preemption; (vi) the form of License Agreement; and (vii) at any time after the six-month anniversary of the Closing Date, the Service Specific Terms and Conditions; provided that in each case any such amendment to such provisions shall not apply to Service Orders or Service Contracts outstanding on the date of such amendment, except with the written consent of both the Company and the Distributor as contemplated by Section 23.1. Any such amendment pursuant to this Section 23.3 shall be effective upon notice to the Distributor of such amendment. If any of the Annexes hereto applicable to a Service Contract have been amended after the Effective Date, the Service Contract shall specify the version of the relevant Annex that applies to such Service Contract.

23.4    Discontinuance and Start-Up of Service. Notwithstanding this Section 23, it is within the Company's discretion to discontinue offering any particular Service or to offer any particular Evolved Service. For the avoidance of doubt, this Section 23.4 does not give the Company the

right to cease providing any Service to the Distributor that is the subject of an outstanding Service Order or Service Contract.

## 24.   ASSIGNMENTS

None of the Parties hereto may assign, transfer, convey or delegate in any manner, any of their respective rights, duties or obligations under this Agreement without the prior written consent of the other Parties hereto, which consent shall not be unreasonably withheld or delayed.

## 25.   WAIVER

25.1   Delay. No delay by either Party in exercising, or failing to exercise, any right or remedy hereunder and no custom or practice of the Parties at variance with the terms hereof shall constitute a waiver of any of the Parties' rights or remedies hereunder.

25.2   Waiver. No waiver by either Party of any particular default by the other Party shall affect or impair either Party's rights in respect of any subsequent default of any kind by the other Party, nor shall any delay or omission of either Party to exercise any rights arising from any default affect or impair a Party's rights in respect of the said default or any other default of the other Party hereunder. Subsequent acceptance by the Company of any payments by the Distributor shall not be deemed a waiver of any preceding breach by the Distributor of any of the terms or conditions of this Agreement.

25.3   Challenges. Each of the Company and the Distributor hereby agrees that it shall not, directly or indirectly, in any way challenge or question the validity or enforceability of this Agreement or any of the transactions contemplated hereby, including, without limitation, asserting any claim whatsoever that this Agreement or any provision hereof or transaction contemplated hereby conflicts with, or constitutes a breach of, the INTELSAT Agreement or the Operating Agreement or any claim questioning or challenging the rapid implementation or provisional application of any amendment to the INTELSAT Agreement or the Operating Agreement.

25.4   Partial Exercise. The single or partial exercise of any right, power or remedy provided by law or under this Agreement shall not preclude any other or further exercise of it or the exercise of any other right, power or remedy.

25.5   Non-Exclusivity. The rights, powers and remedies provided in this Agreement are cumulative and not exclusive of any rights, powers and remedies provided by law.

## 26.   INVALIDITY

Should any provision of this Agreement be found to be invalid, illegal or unenforceable under the laws of any relevant jurisdiction in any respect, the invalid, illegal or unenforceable aspects of such provision shall be given no effect and shall be deemed not to be included in this Agreement without invalidating any of the remaining provisions of this Agreement. The Parties shall forthwith enter into good faith negotiations to amend the Agreement in such a way that, as amended, the Agreement is valid, legal, enforceable, and, to the maximum extent possible, reflects the intended effect of the provision found to be invalid, illegal or unenforceable.

27.    **NOTICES**

27.1    Notices. Any contractual notice served under this Agreement (including invoices and any other written communications required under this Agreement) shall be in writing and shall be given by any two (2) of the following methods: hand, fax, international courier (such as TNT, DHL or Federal Express) or certified or registered mail to the fax number or address specified below for each Party, or such other address or fax number as may be notified by either Party in writing to the other Party. A notice will be deemed to have been received on the Business Day following the transmission of the notice by fax or the day that it is delivered to the applicable address by hand or international courier or fifteen (15) Business Days after it has been dispatched by certified or registered mail.

27.2    Company Information. The Company's address and fax numbers for the service of any notice by the Distributor under this Agreement shall be:

[          ]
[          ]
[          ]

27.3    Distributor Information. The Distributor's address and fax number for the service of any notice by the Company under this Agreement shall be:

[          ]
[          ]
[          ]

28.    **LANGUAGE AND COMMUNICATIONS**

28.1    Language. All written communications required under this Agreement shall be in the English language.

28.2    Communications. All communications pertinent to the Authorization shall be made or confirmed in writing.

29.    **ENTIRE AGREEMENT AND RELATIONSHIP OF PARTIES**

29.1    Entire Agreement. Except in the case of fraud, no Party shall have any right of action against any other Party to this Agreement arising out of or in connection with any draft, agreement, undertaking, representation, warranty, promise, assurance or arrangement of any nature whatsoever, whether or not in writing, relating to the subject matter of this Agreement made or given by any person at any time prior to the date of this Agreement except to the extent that it is repeated in this Agreement.

29.2    Relationship of the Parties. The Parties intend that the relationship created between them by this Agreement shall be as independent contractors. This Agreement is not to be construed in any way as creating any partnership, principal-agent, master-servant, joint venture or other similar relationship between the Parties.

30. **SETTLEMENT OF DISPUTES**

30.1 Mediation. Subject to Section 11.6, the Parties shall use all reasonable endeavors to resolve any dispute within thirty (30) days from the date either Party has given written notice of the existence of such dispute to the other, which shall include mediation if both Parties so agree.

30.2 Arbitration. Either Party may submit at any time any dispute, controversy or claim arising out of or relating to this Agreement or the breach, termination or invalidity thereof, for settlement by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce in effect on the Effective Date of this Agreement before a panel of three arbitrators designated pursuant to those rules and the decision shall be binding on the Distributor and the Company. The place of arbitration shall be Paris, France, unless otherwise mutually agreed by the Distributor and the Company.

30.3 Injunctive and Equitable Relief. Any Party may apply to any competent court or other judicial authority for equitable (including injunctive) relief at any stage prior to or after the commencement of an arbitration under Section 30.2, provided that such Party would be entitled to seek such equitable relief under the laws of England.

30.4 Consents. The Distributor irrevocably:

  (a) consents generally to relief being given against it in any jurisdiction by way of injunction or order for specific performance or for the recovery of any property whatsoever or other provisional or protective measures and to its property being subject to any process for the enforcement of a judgment or any process effected in the course or as a result of any action in rem;

  (b) waives, and agrees not to claim, any immunity from suits and proceedings (including actions in rem) in any jurisdiction and from all forms of execution, enforcement or attachment to which it or its property is now or may hereafter become entitled under the laws of any jurisdiction and declares that such waiver shall be effective to the fullest extent permitted by such laws; and

  (c) waives any objections to the jurisdiction of any court referred to in Section 32.

31. **GOVERNING LAW**

31.1 Governing Law. This Agreement is to be governed by and construed in accordance with English law.

31.2 Agent for Service of Process. The Distributor shall, within thirty (30) days of execution of this Agreement, appoint an agent in England for service of process or any other document or proceedings in relation to the subject matter of this Agreement, and shall notify the Company forthwith of the name and address of such agent. The address of the Company for service of such process and any other such document or proceedings shall be that specified in Section 27, unless and until any alternative addresses are notified to the Distributor. If the agent for service for the Distributor at any time ceases for any reason to act as such, the Distributor shall appoint a replacement agent having an address for service in England or Wales and shall notify the Company of the name and address of the replacement agent. Failing such appointment and notification, the Company shall be entitled by notice to the Distributor to appoint a replacement

agent to act on behalf of the Distributor. The provisions of this section applying to service on an agent apply equally to service on a replacement agent.

## 32.    JURISDICTION

Subject to Section 30, the courts of England are to have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement. Any proceeding, suit or action arising out of or in connection with this Agreement ("Proceedings") may therefore be brought in the English courts. This jurisdiction agreement is irrevocable and is for the exclusive benefit of the Company. Nothing contained in this section shall limit the right of the Company to take Proceedings against the Distributor in any other court or in the courts of more than one jurisdiction at the same time.

## 33.    COUNTERPARTS

This Agreement may be entered into by the Parties on separate counterparts, each of which, when executed and delivered, shall be an original, but all the counterparts shall together constitute one and the same instrument.

## 34.    FORCE MAJEURE

34.1    Force Majeure Events. Subject to Section 34.3, neither Party shall be liable for failure to perform under this Agreement due to any act, event or cause beyond its reasonable control ("Force Majeure Event") including, but not limited to:

(a)    acts of God, peril of the sea, accident of navigation, war, terrorism, riot, insurrection, civil commotion, national emergency (whether in fact or by law), martial law, fire, lightning, flood, cyclone, earthquake, landslide, storm or other adverse weather conditions, explosion, power shortage, strike or other labor difficulty (whether or not involving Company or Distributor employees), epidemic, quarantine, radiation or radioactive contamination;

(b)    action or inaction of any government or other competent authority (including any court of competent jurisdiction), including expropriation, restraint, prohibition, intervention, requisition, requirement, direction or embargo by legislation, regulation, decree or other legally enforceable order, or refusal to grant or revoke a license if such refusal is not occasioned by failure of the Party to apply therefor, prosecute applications as necessary or to comply with applicable law or regulation but excluding, in the case of the Distributor, any action or inaction of any government or other competent authority of the jurisdiction in which the Distributor is organized or any country in which the Distributor operates; and

(c)    external transmission interference (other than transmission interference caused by the users of the Space Segment) or satellite failure, or satellite launch failure or delay, or satellite malfunction.

34.2    Further Consequences. In the event that a Force Majeure Event exceeds thirty (30) consecutive days, then following such thirty (30) day period, the Parties shall meet and negotiate the continuation, suspension, termination, restructuring or other disposition of this Agreement. Upon removal or cessation of the Force Majeure Event, all obligations under this Agreement shall resume.

34.3 Payment Obligations. Except in cases where a Force Majeure Event has been invoked by the Company as a defense for the failure to perform its obligations hereunder, the Distributor shall remain liable for all of its payment obligations hereunder, regardless of the occurrence of a Force Majeure Event.

## 35.   FURTHER ASSURANCE

Each of the Parties agrees to cooperate at all times from and after the date hereof and to perform (or procure the performance of) all further acts and things, and execute and deliver (or procure the execution and delivery of) such further agreements, releases, notifications and other documents, as may be required by law or as may be necessary or reasonably desirable to implement and/or give effect to the transactions contemplated by this Agreement.

## 36.   BINDING EFFECTS

This Agreement shall be binding upon, and shall inure to the benefit of, the Parties hereto and their respective successors and permitted assigns.

## 37.   MISCELLANEOUS

37.1 Contracts (Rights of Third Parties) Act 1999. The Parties to this Agreement do not intend that any term of this Agreement should be enforceable, by virtue of the Contracts (Rights of Third Parties) Act 1999, by any person who is not a Party to this Agreement.

37.2 No Set-Off by the Distributor. All payments to be made by the Distributor to the Company under this Agreement shall be made in full. They will be free and clear of any right of set-off and from any restriction, condition or deduction because of any counterclaim.

37.3 Costs and Expenses. Except as otherwise stated in this Agreement, each Party shall pay its own costs and expenses in relation to the negotiation, preparation, execution and carrying into effect of this Agreement and other agreements forming part of the transaction.

AS WITNESS duly authorized representatives of the Parties have signed this Agreement on the day and year above written.

SIGNED by John Stanton
for and on behalf of
the Company

)Intelsat U.K., Ltd.
)John Stanton, President

SIGNED by Mason L. Parker (Printed Name) )  Mason L. Parker
for and on behalf of   NAS Global Networks, Inc.
the Distributor

## MEMORANDUM OF AMENDMENT No. 1 TO NON-EXCLUSIVE SERVICE DISTRIBUTION AGREEMENT

This Memorandum of Amendment is made this 9ᵗʰ day of ___April___ 2003 by and between Intelsat USA Sales Corp. ("Intelsat"), a company incorporated under the laws of Delaware, with offices at 3400 International Drive, N.W., Washington D.C. 20008 and NAS Global, Inc. (the "Customer"), a company incorporated under the laws of Maryland with offices located at 1121 University Blvd. #619, Silver Spring, MD 20902 (collectively, sometimes hereinafter referred to as the "Parties")

WHEREAS, the Parties desire to amend the Terms and Conditions of the Non-Exclusive Service Distribution Agreement ("the Agreement") as hereinafter set forth.

NOW THEREFORE, the Parties agree to amend the Terms and Conditions of the Agreement as follows:

All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Agreement.

1.    Clause 11 Charges and Payment Terms

Sub-clause 11.5 (a) Payment Terms is hereby amended by deleting this sub-clause in its entirety and replacing it with the following: "Invoices will be issued in U.S. dollars in respect of each month at the beginning of the calendar month that the Distributor is scheduled to receive the invoiced Services. All Charges shall be paid by the end of the month in which Service was received. Payments not received by their due date will be subject to interest charges at the London Interbank Offered Rate plus 4% per annum and no additional Services will be approved until payment in full has occurred. Other billing terms may be stipulated by the Company".

2.    Clause 11.6 Invoice Disputes is hereby amended by deleting this clause in its entirety and replacing it with the following: "In the case of any dispute, the Distributor shall notify the Company as soon as possible, but in any event within 20 days of the date of the Invoice that is in dispute. The Distributor shall pay the undisputed amount by the relevant payment due date. The Parties shall use all reasonable efforts, including provision of relevant records, to resolve any dispute within 60 days from the date of the relevant invoice. If it is determined that the Distributor should pay the disputed amount to the Company, then the Distributor shall pay interest in accordance with Section 11.5. Any invoice that is not disputed in accordance with this Section shall be considered final.

In the event that the Company and the Distributor are unable to resolve a dispute in accordance with this Section, within the 60 day period specified above, either Party shall be permitted to pursue legal remedies available to it under applicable law."

3.    This Amendment shall be effective from 01 April 2003.

Except as herein amended, all other provisions of the Agreement shall remain in full force and effect. In the event of any conflict between the terms of this Amendment and those of the Agreement, the terms of this Amendment shall supersede those of the Agreement and exclusively govern the matter in question.

IN WITNESS WHEREOF, the Parties hereto have executed or caused to be executed this Amendment as

Intelsat USA Sales Corp.

By: _____

Print Name: PAUL F KONONT

Title: DIRECTOR, USA SALES MANAGEMENT

NAS Global Networks, Inc.

By: _____

Print Name: Richard Park

Title: Director